In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00412-CR
_____


CEDRICK LAMAR WILSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
Liberty County, Texas
Trial Cause No. 102641

OPINION

A jury convicted Cedrick Lamar Wilson[1] of criminal trespass, a Class B misdemeanor. Tex. Penal Code Ann. § 30.05(d)(1) (West Supp. 2016).[2] Wilson appealed from the judgment, and in four issues, he contends:

---

[1] The trial court rendered judgment against "Cedric" Lamar Wilson, but the information, which charged Wilson with criminal trespass, and Wilson's signatures, which are found on some of the documents that are in the record, indicate that the spelling of Wilson's first name is "Cedrick." In our Court, the

1. His constitutional rights to receive procedural due process were violated by the City's unwritten building-use policy, which allowed the City Manager to exercise his discretion about when to prohibit individuals from entering the Community Center.

2. The City's unwritten building-use policy could not be enforced against Wilson because it is too vague.

3. The City's unwritten building-use policy did not have sufficient guidelines to prevent the City Manager from enforcing the policy in an arbitrary and irrational manner.

4. The evidence before the jury in Wilson's trial was insufficient to support Wilson's conviction for criminal trespass.

Wilson's issues revolve around whether the City's unwritten building-use policy provided the City Manager with valid authority to restrict Wilson from the Community Center. In his appeal, we note that Wilson does not challenge the constitutionality of section 30.05 of the Texas Penal Code, the criminal-trespass

Clerk docketed the appeal using the name "Cedrick" because Wilson used that spelling in his notice of appeal.

[2] Although the Legislature amended the criminal-trespass statute after the date Wilson is alleged to have trespassed at the Community Center, the changes to the criminal-trespass statute are not pertinent to the arguments Wilson raises in his appeal. Therefore, throughout the opinion, we cite the current version of the statute.

statute on which his conviction is based. *See* Tex. Penal Code Ann. § 30.05 (West Supp. 2016). Additionally, Wilson also has not argued he was selectively prosecuted in violation of his constitutional rights based on his status as a member of a protected class.

While a clear and written building-use policy might have given Wilson guidelines regarding the conduct expected of him while using the facilities at the Community Center, Wilson's remedy for his complaints about the City's unwritten policy is a civil matter that Wilson should seek to remedy by lobbying City Council. The elements of the criminal-trespass statute do not include a requirement that the State prove that the owner or occupier of the premises gave the defendant prior notice about the types of conduct that could result in the defendant's losing his right to enter the premises where the trespass occurred. We further conclude that the evidence was sufficient to show that the City authorized the City Manager to exclude Wilson from the Community Center, and that the evidence before the jury in Wilson's trial authorized the jury to return a verdict finding Wilson guilty of criminal trespass.

## Background

In an information, the State accused Wilson of criminal trespass, alleging that Wilson intentionally or knowingly entered the Dayton Community Center on

3

July 8, 2015, without the effective consent of the Community Center after he was given notice that his entry to the Community Center was forbidden. In the charge that was submitted to the jury, the trial court instructed that "[a] person commits an offense [of criminal trespass] if he enters or remains on or in property or in a building of another without effective consent and he: (a) had notice that entry was forbidden; or (b) received notice to depart but failed to do so." In relevant part, the charge also stated that the term "notice" means "oral or written communications by the owner or someone with apparent authority to act for the owner[.]" Wilson did not object to the charge during the charge conference, and he also did not ask the trial court to submit any additional instructions to the jury. When the jury returned its verdict, it found Wilson guilty and found that he should serve a sentence of ninety days in county jail.

The testimony from Wilson's trial provides the relevant background for the complaints that Wilson raises on appeal. Four witnesses testified during the guilt-innocence phase of the trial: (1) David Douglas, the City Manager for the City of Dayton; (2) Sherry Sikes, the director of the Jones Library, a library located inside the Dayton Community Center; (3) Officer Christopher Boufford, the Dayton police officer who warned Wilson on the instructions of David Douglas that

4

Wilson would no longer be allowed to return to the Dayton Community Center; and, (4) Mya Wilson, Wilson's sister, who testified in Wilson's defense.

The testimony in the trial established that on July 2, 2015, six days before Wilson was arrested for trespass, Officer Boufford gave Wilson an oral and written warning that he could not return to 801 South Cleveland, the Dayton Community Center's address. In his testimony, Officer Boufford indicated that on July 2, David Douglas asked him to issue the warning to Wilson because Douglas had observed Wilson "harassing some females that were using the facilities at the [Community] Center." When Officer Boufford located Wilson and gave him the written criminal-trespass warning, he told Wilson that if he had any complaints about the warning to discuss them with the City Manager. On appeal, Wilson does not dispute the evidence showing that on July 2, Officer Boufford warned him as instructed by Douglas that he was not to return to the Community Center.

During the trial, Dayton's City Manager, David Douglas, explained why he told Officer Boufford on July 2 to give Wilson a criminal-trespass warning. According to Douglas, he decided to ban Wilson from the property based on Wilson's conduct at the Community Center on July 2, which he observed, and based on complaints that he had received about Wilson from people who worked at the Community Center. According to Douglas, the City of Dayton and the Dayton

5

Chamber of Commerce have employees who work at the Community Center. Douglas testified that various females who worked at the Community Center had complained to him about the way Wilson was acting at the Community Center. Generally, viewed in the light most favorable to the jury's verdict, the complaints Douglas described concern conduct that the jury could reasonably have viewed as inconsistent with the Community Center's purpose.

Among the complaints Douglas received before July 2 were complaints that Wilson had a habit of staring "for hours on end" at the female employees who worked at the Community Center. Other complaints related to Wilson's conduct of sleeping on furniture in the lobby. According to Douglas, sleeping in the lobby was "not allowed." Employees, who reported that Wilson had been found sleeping in the lobby, complained that on waking him, he had become confrontational. According to Douglas, the women working in the Community Center were afraid of Wilson because he was volatile, cursed, and in general, "creeped [the female employees at the Community Center] out[.]" Additionally, Douglas expressed his view that Wilson had "gotten in the bad habit of stopping females" at the Community Center, and Douglas testified that he was concerned that if Wilson scared someone when approaching them, he might be shot.

Douglas also described observing Wilson's conduct on July 2. Douglas testified that while at the Community Center on July 2, he saw Wilson approach and stop two females who were inside the Community Center. After Douglas observed Wilson encounter these individuals, he then saw Wilson go outside the building, where he sat down on a bench. A short time after Wilson sat on the bench, Wilson jumped up and ran toward a person Douglas saw jogging down a street that ran in front of the Community Center. Douglas thought that the jogger saw Wilson approaching, and he observed the jogger change her path to avoid Wilson. Wilson then returned to the Community Center, and Douglas indicated that he saw Wilson encounter two more females entering the Community Center. Douglas's testimony, when viewed in the light most favorable to the jury's verdict, allowed the jury to infer that Douglas was concerned that Wilson was selectively approaching females at the Community Center in a way that appeared to him, from the interactions that he observed, to be unwanted. Douglas testified that after observing Wilson's conduct at the Community Center on July 2, he went outside the building, where he told Wilson that "his behavior was unacceptable[,]" "to get off the City's property," and "that he was no longer welcome there[.]" According to Douglas, when he confronted Wilson on July 2, Wilson became belligerent. Douglas described Wilson's behavior towards him that day as "a little unnerving,"

7

indicating that Wilson told him that "he owned the Community Center," and that Douglas worked for him. Eventually, Wilson left the City's property. After Wilson left, Douglas told the City's employees at the Community Center to call the police if Wilson returned. Douglas indicated that Wilson's ban from the Community Center was permanent.

Douglas also addressed why he had the authority to ban Wilson from the Community Center. While Douglas agreed that the City had no written building-use policy that applied to the Community Center, Dayton's City Council had the right to decide who could enter the buildings the City owned. Although Douglas agreed that City Council had not given him any specific directions about behaviors that Council deemed to be unacceptable at the Community Center, he testified that he enforced "the rules [at the Community Center] in relationship to the safety of the people." According to Douglas, as City Manager, he had the right to exercise his discretion about how individuals could act while on the City's property to allow all of the people using the City's property to use it safely. Douglas testified that he had the right to protect others from Wilson based on his concerns for public safety.

Douglas only briefly addressed how his decision banning Wilson from the Community Center could have been challenged at a City Council meeting. And, the details regarding how Wilson might have challenged his decision to ban

8

Wilson from the Community Center were not well developed in the trial. For example, the City's charter was not admitted at trial. Nonetheless, to the extent the record contains evidence that addressed whether a right to challenge a city official's decisions exists, Douglas testified that although no written policy existed outlining the procedure Wilson could have used to challenge his decision, his decision could have been challenged by complaining about it to City Council or to the Mayor.

Wilson was arrested when he returned to the Community Center on July 8, 2015. Sherry Sikes, the director of Dayton's public library, called the police on July 8 when she saw Wilson at the Community Center. Sikes also testified that people in the library were afraid of Wilson, and she explained why she thought that Wilson made people uncomfortable. According to Sikes, before Wilson was banned from the Community Center, he visited the library almost every day. Sikes explained that when Wilson came to the library, he generally sat at a computer that was available for the public's use. Sikes indicated Wilson typically sat at the computer counting "his fingers or something like that." According to Sikes, she had observed Wilson over a long period and he was not normal.

After the State rested, Wilson called his sister, Mya Wilson, who testified in his defense. According to Mya, Wilson is a disabled veteran, and he has been

9

diagnosed with "[s]chizophrenia bipolar" disorder. Mya stated that before Wilson moved to Dayton, he had lived with her for several years. Mya testified that when Wilson lived with her, he took his medications, and she felt that he "was fine." However, Mya also indicated that Wilson's condition had deteriorated over the years after his mental problems became apparent, and she expressed the opinion that Wilson's condition had become worse around the time that he moved to Dayton. Mya explained that Wilson had been diagnosed at a state medical facility as having "a bunch of different personalities." According to Mya, after moving to Dayton, Wilson had been living in a condemned home for approximately one year. Mya stated that she was unaware whether Wilson, while living in Dayton, had continued to take the medications that his doctors had prescribed for him. Mya expressed concern that after Wilson moved, no one was available in Dayton to take Wilson to a store where he could purchase his medications. Also, Mya stated that before Wilson moved, she attempted to convince him to see a doctor at the Veterans Administration, but he refused.

Generally, Mya's testimony supports the State's claim that Wilson was using the Community Center in ways that were inconsistent with its purposes. For example, Mya testified that she understood why people would fear Wilson based on the way he interacted with others. Mya explained that in his encounters, Wilson

10

liked to approach strangers and talk with them, but he did not attempt to talk "about normal stuff." According to Mya, when Wilson approached others, he tended to attempt to talk to them about conspiracies, about owning property that was not his, or about how people had taken things from him. Mya stated that Wilson would no longer talk to her, and she indicated that she last spoke with Wilson in May or June, 2014. Mya expressed the opinion that Wilson was generally well behaved, but if he became upset, or if he perceived the person who he was talking to was afraid, he could become confrontational. When asked if people were afraid of Wilson, Mya answered: "Yeah, I would be." Mya testified that she feared that Wilson's condition had deteriorated to the point that her daughters, who lived with her, would not be safe if Wilson were to live with them.

## Were Wilson's Arguments Preserved?

In his first three issues, Wilson asserts various constitutional complaints directed to the City of Dayton's unwritten policy allowing the City Manager to exclude individuals from its property. On appeal, the State argues that Wilson failed to properly preserve his complaints about the City's unwritten building-use policy for our review.

With respect to the City's use of the Community Center, Wilson contends that because the City had no written policy describing the types of conduct that

11

would not be tolerated at the Community Center, he had no prior notice that the City would deem his conduct unacceptable and ban him from the Community Center. Wilson also argues that he had no ability under the City's unwritten policy to challenge the City Manager's decision, and he complains the City Manager, without written guidelines, was free to arbitrarily decide whether his conduct had been sufficiently inappropriate to result in a permanent ban. Wilson contends that without clear written guidelines, the City's building-use policy could not be applied to him without violating his constitutional rights.

The record from Wilson's trial shows that when the State rested, Wilson moved for a directed verdict of acquittal, arguing:

> Your Honor, the defense requests a directed verdict on the basis that the governmental policy governing who is and is not permitted on public property, who can be banned from public property, is unconstitutional and that it violates the due process -- violates the due process clause because it is unconstitutionally vague. It also violates procedural due process, and because of the due process violation the governmental policy is void.

The trial court overruled Wilson's motion.[3] Because the record from the trial court shows that Wilson secured a ruling on the same arguments that he presents in his

---

[3] Wilson made it clear to the trial court that he was not challenging the constitutionality of the criminal-trespass statute. When Wilson finished the presentation of his arguments relating to his motion for directed verdict, the trial court said: "You're wanting the Court to declare that the statute that we're having to deal with which permits [an arrest for trespass] unconstitutional?" Wilson's

12

appeal, he did not waive his right to our review of whether the criminal-trespass statute could be enforced given the complaints that he raised about the way the City applied its unwritten policy to him. *See* Tex. R. App. P. 33.1(a).

### Do Wilson's Constitutional Arguments about the City's Building-Use Policy Present Cognizable Claims as Related to His Conviction?

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court instructs courts to resolve challenges raising insufficiency challenges by applying the standard of review identified in *Jackson* "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16. Under Texas law, an appeals court reviews the sufficiency of the evidence by examining the elements of the offense, as the offense is defined by State law, against the evidence that is admitted to the jury in the defendant's trial. *Fuller v. State*, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002). In Wilson's case, based on the elements of the criminal-trespass statute, Wilson's conviction rests on his conduct in returning to the Community Center on July 8 after having been informed on July 2 of the City Manager's decision that he could no longer be there. *See* Tex. Penal Code Ann. § 30.05. The statute does not require the State to prove that the

---

attorney responded: "No, sir. No, sir. Not at all." Then, Wilson's attorney explained that his complaints concerned "the City's effective policy[.]"

13

premises owner or the occupier gave the defendant prior notice of the reasons that it might use to insist that someone leave its property. *Id.*

As a city manager, Douglas possessed the authority to manage the City of Dayton's property. *See* Tex. Loc. Gov't Code Ann. § 25.029(a) (West 2008); *Id.* § 282.001(a) (West 2005). We take judicial notice that the City of Dayton is a home-rule city, and that it derives its power from article XI, section 5 of the Texas Constitution.[4] Tex. Const. art. XI, § 5; *see* Article 2, Section 2.01, Home Rule Charter for the City of Dayton, available at http://www.cityofdaytontx.com/documentcenter/view/160 (last visited August 22, 2016).

The evidence shows that at the instruction of Dayton's City Manager, a City of Dayton police officer gave Wilson a criminal-trespass warning on July 2, 2015. While it was relevant whether the City Manager was authorized under Texas law or under the City's policies to exclude Wilson from the Community Center on July 2, Wilson did not commit any criminal conduct in violation of state law based on Wilson's conduct that Douglas described observing on July 2. In our opinion, Wilson's complaints about Douglas's decision banning him from the Community

---

[4] We are authorized to take judicial notice of legislative facts. *Compare Emerson v. State*, 880 S.W.2d 759, 765 (Tex. Crim. App. 1994) ("Judicial notice, both of adjudicative and legislative facts, may be taken on appeal."), *and Gonzales v. State*, 723 S.W.2d 746 (Tex. Crim. App. 1987) (noting that courts may take judicial notice that home-rule city has been incorporated), *with* Tex. R. Evid. 201(a) (authorizing courts to take judicial notice of adjudicative facts).

14

Center is a civil matter, and as such, Wilson could have pursued his complaints about Douglas's decision to ban him from the Community Center in one of the regular meetings of Dayton City Council. *See* Article 3, Section 3.12, Home Rule Charter for the City of Dayton, available at http://www.cityofdaytontx.com/ documentcenter/view/160 (last visited August 22, 2016). Or, if he could prove that Douglas's decision banning him from the Community Center was either irrational or arbitrary, Wilson could have sought to enjoin the City from enforcing Douglas's decision. *See, e.g.,* 42 U.S.C. § 1983 (permitting civil causes of action for claims alleging that a governmental actor has violated an individual's constitutional rights); *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1528 (5th Cir. 1993) (stating that a violation of a person's right to substantive due process "may require courts to void certain types of government action"); *City of Elsa v. M.A.L.,* 226 S.W.3d 390, 392 (Tex. 2007) (noting that suits seeking equitable relief for violations of an individual's constitutional rights are not prohibited); *City of San Antonio v. TPLP Office Park Props.*, 218 S.W.3d 60, 64-65 (Tex. 2007) (discussing requirement under substantive due process that City's exercise of the police power cannot be arbitrary and unreasonable); *see also* U.S. Const. amend. XIV (prohibiting the State from enforcing any law abridging privileges or immunities of a citizen of the United States).

15

The conduct that the criminal-trespass statute criminalizes is an individual's conduct of returning to another's property after having been notified that his entry onto the property is forbidden. Tex. Penal Code Ann. § 30.05 (a)(1). Wilson was convicted for returning to the Community Center on July 8. When focused on the elements of the criminal-trespass statute, the statute does not require the State to prove that the defendant was given prior notice of the types of conduct that might lead the owner or occupier of the premises to ban a person from its premises. *See id.*, § 30.05. Instead, the statute requires the State to prove that the defendant was warned by someone with the authority to do so that he could no longer enter the owner's property, a standard that is easily understood by ordinary persons.[5] *See* Tex. Penal Code Ann. § 30.05(a)(1).

---

[5] Even if we were to consider Wilson's complaints that the City's policy allowed no right to appeal, and that the City failed to notify him about the procedures he could have followed to complain about Douglas's decision banning him from the Community Center, Wilson failed to carry his burden to prove that he had no rights of appeal. Wilson failed to put into evidence the City Charter, and without it, he failed to carry his burden of proving that the procedures available to him under the City of Dayton's Charter provide individuals like Wilson to challenge the decisions of a city official like Douglas. Additionally, the City was not required to advise Wilson regarding the procedures that he might have followed to challenge Douglas's decision banning him from the Community Center, as the evidence shows that Wilson knew that Douglas was the person who caused the criminal-trespass warning to issue. *See City of W. Covina v. Perkins*, 525 U.S. 234, 240-43 (1999) (rejecting claim that a citizen was entitled to individualized notice from the City regarding the state law remedies available to him to have the police return his property, which had been seized in a search).

We conclude that an adequate civil remedy exists for the types of complaints that Wilson raised in his trial concerning Douglas's decision to permanently ban him from the Community Center. Furthermore, we conclude that the State was not required to prove that Wilson had actual or constructive notice of its building-use policies to prove that he committed a trespass. *See* Tex. Penal Code Ann. § 30.05 (setting forth the substantive elements of criminal trespass).

Both at trial and in his appeal, Wilson relies heavily on the Texarkana Court of Appeals' decision in *Anthony v. State*, 209 S.W.3d 296 (Tex. App.—Texarkana 2006, no pet.), to support his position that the trial court erred in denying his motion for directed verdict. In *Anthony*, the City of Henderson had an unwritten policy that allowed its police officers to ban people from the City's parks at the officers' discretion. *Id.* at 301. In *Anthony*, our sister court held that the City of Henderson's unwritten policy regarding the use of its parks was unconstitutional on the basis that the policy violated Anthony's rights to procedural due process and because it was unconstitutionally vague. *Id.* at 310-11. The court in *Anthony* concluded that the officer who decided to exclude Anthony from the park was not properly authorized to do so, despite testimony that the officer had such authority. *Id.* at 310. The Texarkana Court of Appeals reversed Anthony's conviction by

17

finding the evidence insufficient to support the effective-consent element required for the offense of criminal trespass. *Id*. at 310.

While we agree that a governmental entity's building-use policy might be relevant to deciding whether a governmental official had the authority to exclude others from a governmental building, the State was not required to prove that Wilson had actual or constructive notice of what behaviors would result in a demand that he leave the City's property. To the extent that *Anthony* implies that constructive notice of a governmental entity's building-use policy is an element of the offense of criminal-trespass, we disagree.

Under the Constitution, governmental entities have the same rights as private property owners to control their properties, so long as the entity's policies are not employed as a subterfuge for illegal discrimination. In *Adderley v. Florida*, which concerned a defendant's challenge to the validity of Florida's trespass statute, the United States Supreme Court recognized: "The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." 385 U.S. 39, 48 (1966). Moreover, because one of the required elements of proving criminal trespass requires the State to prove that the entity in possession of the property warned the defendant that he could not return to the property, the statute does not require the defendant to speculate about what

18

aspect of his conduct the statute proscribes. *See Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

The evidence in Wilson's case demonstrated that Douglas excluded Wilson from the Community Center because Wilson was using the Community Center in a manner that Douglas reasonably viewed as being inconsistent with the building's legitimate public purpose. The evidence also shows that Douglas, as the City Manager, had a superior right as compared to Wilson to control the property at issue. In his brief, Wilson has not claimed that he had a constitutional right to use the Community Center in any way he chose. Additionally, the evidence allowed the jury to reasonably conclude that Wilson's use of the property on July 2 was inconsistent with the facility's purpose.

We conclude that the evidence supports the jury's conclusion that Douglas, acting as Dayton's City Manager, had the right to exclude Wilson from the Community Center. *See Adderley*, 385 U.S. at 47. ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *see also Ray v. State*, No. 03-14-00538-CR, 2016 Tex. App. LEXIS 3213, *3 (Tex. App.—Austin Mar. 30, 2016, no pet.) (not designated for publication) (explaining that the court would not consider the defendant's arguments about the constitutionality of a hospital's lack of a written

building-use policy in evaluating whether the defendant's conviction for criminal trespass should be affirmed). We overrule issues one, two, and three.

Is the Evidence Sufficient to Support Wilson's Conviction?

In issue four, Wilson argues that the evidence is insufficient to support his conviction for criminal trespass. According to Wilson, the evidence failed to sufficiently establish that Douglas had the authority to exclude him from the Community Center. Additionally, Wilson argues the evidence before the jury was insufficient to show that the City, as of July 8, had effectively withdrawn his right to use the Community Center.

In a review of a complaint challenging the sufficiency of the evidence, we assess all of the evidence admitted in a defendant's trial in the light that most favors the verdict to determine whether the evidence, beyond reasonable doubt, authorized a rational trier of fact to find the defendant guilty of the crime with which he was charged. *Jackson*, 443 U.S. at 318-19; *see also Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In reviewing the evidence, the factfinder, not the appeals court, is the ultimate authority on the credibility of the witnesses and the weight that should be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). As the factfinder, a jury is given the responsibility to

20

fairly resolve any conflicts that may exist in the testimony, to weigh the evidence admitted during trial, and to draw reasonable inferences from the facts to determine whether the defendant committed the crime with which the defendant was charged. *See Hooper*, 214 S.W.3d at 13. If the evidence before the jury raises inferences that are in conflict, we presume the jury resolved those conflicts in a manner that is consistent with its verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Although we defer to the jury's resolution of the facts, our review is to determine whether the jury's inferences from the facts that were before it were "'reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 16-17). Generally, in a sufficiency review, the appeals court is required to uphold the jury's verdict "unless a reasonable juror must have had a reasonable doubt as to at least one of the elements of the offense." *Runningwolf v. State*, 360 S.W.3d 490, 494 (Tex. Crim. App. 2012).

A person commits the offense of criminal trespass if he enters or remains on or in the property of another without effective consent and after receiving notice that his entry onto the property was forbidden. Tex. Penal Code Ann. § 30.05(a)(1); *Salazar v. State*, 284 S.W.3d 874, 876 (Tex. Crim. App. 2009). In a case involving public grounds, the State satisfies the burden of the "of another"

21

element of the criminal-trespass statute by proving, beyond a reasonable doubt, that the complainant has a greater right of possession of the property than does the accused. *See Vanderburg v. State*, 874 S.W.2d 683, 684 (Tex. Crim. App. 1994) (holding that the State may establish ownership in a trespass case by proving that the complainant had a greater right of possession of the property than the defendant); *Arnold v. State*, 867 S.W.2d 378 (Tex. Crim. App. 1993) (same).

The evidence before the jury in Wilson's case shows that the Community Center was built and managed by the City of Dayton, and that the City Manager was in charge of the property. Based on the evidence showing that Douglas was the City Manager and that the Community Center was a facility controlled by the City, the jury was authorized to conclude that Douglas had the right to prohibit Wilson from being on the City's property at the address where the Community Center is located. *See Bader v. State*, 15 S.W.3d 599, 608 (Tex. App.—Austin 2000, pet. ref'd) (concluding that campus police for the University of Texas, as compared to the defendant, had a greater right to the possession of the campus).

Wilson's sufficiency challenge focuses primarily on the State's burden to show that he returned to the Community Center without the City of Dayton's "effective consent." In presenting his argument, Wilson suggests that the City's unwritten policy pertaining to the use of the Community Center was

22

unconstitutional. However, we have already explained that the City's unwritten building-use policy concerns Wilson's conduct on July 2, and explained why Douglas was authorized as Dayton's City Manager to exclude Wilson from the Community Center. The evidence also demonstrates that on July 2, Officer Boufford informed Wilson that he could no longer return to the Community Center. Wilson does not dispute that he returned to the Community Center on July 8. We conclude that ample evidence supports each element required to prove that Wilson was guilty of criminal trespass. We overrule Wilson's fourth issue.

## Conclusion

Having overruled Wilson's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on June 3, 2016
Opinion Delivered October 19, 2016
Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

# DISSENTING OPINION

I respectfully dissent. The majority seems to conclude that section 30.05 of the Texas Penal Code is constitutional because an adequate civil remedy for its potential abuse exists in this case, and decides that, for this reason, Wilson's conviction should be affirmed. But Wilson does not attack the constitutionality of section 30.05 of the Penal Code. *See* Tex. Penal Code Ann. § 30.05 (West Supp. 2016). His complaint centers on the unwritten policy of the City of Dayton, which ostensibly gave the City Manager unfettered authority to ban him from the City of Dayton's property.

In *Anthony v. State*, 209 S.W.3d 296 (Tex. App.—Texarkana 2006, no pet.), the Texarkana Court of Appeals carefully examined a conviction for criminal trespass with facts nearly identical to those of this case. In *Anthony*, the city had an unwritten policy that delegated to its police officers the authority to ban people from public parks at their discretion. *Anthony*, 209 S.W.3d at 301. After a police sergeant gave Anthony notice not to return to a city park, Anthony returned to the park and was arrested for criminal trespass. *Id*. On appeal, Anthony argued, among other things, that the city's policy violated the Due Process Clause and that the evidence was legally insufficient to support his conviction. *Id*.

As part of his Due Process argument, Anthony contended that the unwritten policy was inherently vague and permitted selective law enforcement. *Id*. at 306. As the *Anthony* court noted, to satisfy due-process requirements, a statute or regulation "must provide adequate notice of the required or prohibited conduct." *Id*. The regulation need not be mathematically precise, but it "must be defined with 'sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not permit arbitrary and discriminatory enforcement.'" *Id*. (quoting *State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006)). After noting that the unwritten policy was not premised on a violation of specific rules, delegated complete discretion to the police officer without providing guidelines for the exercise of that discretion, and presented a "substantial risk of arbitrary and discriminatory enforcement[,]" the *Anthony* court concluded that the unwritten policy was unconstitutionally vague. *Id*.

I find the reasoning in *Anthony* persuasive, and I would conclude that there is no meaningful distinction between the facts of *Anthony* and those of this case. Specifically, I would conclude that the fact that *Anthony* involved discretion vested in the police, while the case at bar involves discretion vested in the City Manager, is a distinction without merit. Douglas intended to ban Wilson permanently from the Dayton Community Center (DCC) despite the lack of any written policies

2

governing what types of behavior are unacceptable at DCC. Like the police officers in *Anthony*, Douglas, in his capacity as City Manager, has been given discretion to protect the safety of Dayton's citizens, but there are no guidelines in place to govern Douglas's exercise of his discretion. A reasonable person would not have fair warning of what type of conduct would result in banishment from the property, and the policy presents a substantial risk of arbitrary and selective enforcement. *See id*. I believe that the City of Dayton's unwritten policy vesting unfettered discretion in the City Manager regarding who may be on the City's public premises is unconstitutionally vague. *See id*. I would reverse the conviction and render a judgment of acquittal.

_____
STEVE McKEITHEN
Chief Justice

Dissent Delivered
October 19, 2016

3