In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00050-CR**
_____

**BLAZE DANIEL HICKS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 1A District Court
Tyler County, Texas
Trial Cause No. 13,654

**MEMORANDUM OPINION**

In January 2020, a Tyler County Grand Jury indicted Blaze Daniel Hicks for murder, a first-degree felony. Tex. Penal Code Ann. § 19.02(c). The indictment alleges that on or about September 23, 2019, Hicks intentionally and knowingly caused the death of Brandon Wood by shooting him with a firearm. Following a trial by jury, Hicks was found guilty of murder. In the punishment hearing that followed, also before the jury, the State presented evidence that Hicks had been convicted of committing one other felony, which had become final before Hicks committed the

1

2019 murder. After the jury answered "true" to the enhancement paragraph in the charge, the jury decided Hicks should serve a life sentence. The judgment the trial court signed reflects the jury's verdict.

Hicks appealed and filed a brief raising ten issues for our review. In issue one, Hicks complains the evidence is insufficient to support the verdict. In issues two through seven, Hicks complains about the trial court's rulings admitting some of the testimony and several exhibits into evidence during the trial. In issue eight, Hicks complains about the trial court's ruling admitting evidence of an extraneous offense, namely Hicks's escape from jail while his trial date was pending. In issue nine, Hicks argues there is an error in the charge. In issue ten, Hicks complains the prosecutor engaged in improper jury argument.

For the reasons explained below, we affirm.

Background

On September 23, 2019, Dresden Chatman dropped Maria Clowers off at a residence on County Road 4470, also known as MLK, in Warren, Tyler County, Texas. Virginia Riddick was at the residence when Clowers arrived. Riddick had "some beef" with Clowers at that time. Riddick reached out to Hicks on his Facebook Messenger account "Blazr Hicks," asking him "Wtf your chick doing back over on my block?" In the course of their ensuing dialogue on Facebook Messenger, Hicks expressed disbelief that Clowers had misled him about her whereabouts. He asked

Riddick if Clowers was with "bwood," a nickname for Brandon Wood. Hicks asked Riddick for directions to Clowers's location. Riddick gave him directions to Clowers's location.

Shortly thereafter, Hicks arrived at the property on MLK in a distinctive black Chevrolet truck. The property had two mobile trailers. When Hicks arrived, he asked Riddick which trailer Clowers was in. Hicks told Riddick to get Clowers and said that if Clowers "doesn't come out, then it wasn't going to be good." Riddick went to Clowers's trailer and told her to come to Hicks's truck. As Hicks moved his truck to the other trailer on the property, Virginia's thirteen-year-old son told her, "Momma, he's got a gun. Momma, he's got a gun."

Hicks pulled up to the other trailer and got out of his truck with a gun. Clowers ran out of the trailer and argued for a few minutes with Hicks. Hicks then set his gun back in the truck. Hicks texted Riddick and asked her to walk over to his truck. Riddick complied, talked to Hicks and Clowers for a few minutes, and proceeded to walk to the other trailer.

Hicks told Riddick to "start digging holes" after Clowers stated that "Bwood was the one that always hit me." Hicks got out of his truck, going to the passenger side, where he pushed Clowers. Riddick stepped between the pair and warned Clowers that "you can't do that to somebody like him…you can't play games with

somebody like him." Riddick also heard Hicks tell Clowers, "You're going to die today."

Along with making verbal threats to Clowers, Hicks made threats against Brandon Wood that same day. On Facebook Messenger, Hicks asked Virginia, "[I]s bwood bitch ass there ima whoop thst [sic] boy." "Bwood" was a reference to Brandon Wood. Hicks continued in the messages, "Anybody I don't like or fucked up bout something im war mode."

Hicks had been looking for Wood for some time. In a Facebook Messenger message to Clowers on August 8, 2019, Hicks told her, "[I]m looking for trey right now and bwood. they are green lights." According to Brian Seales, the Tyler County Sheriff's Office investigator who worked the case, the term "green light" generally means that the Aryan Brotherhood has put a kill order out for someone. When Clowers asked why Wood was a target, Hicks replied, "SWS." Seales testified that "SWS" was a reference to Solid Wood Soldiers, a white supremacy gang.

Joseph Prothro was at the property on MLK on the day of the incident. Clowers approached Prothro's trailer bawling, saying "that [Hicks] was going to kill her." Prothro then went outside and saw Hicks in a black truck backing out of the yard. He asked Hicks why he was at the residence, and Hicks responded that "Maria had been texting him to come get her." As they talked, Wood walked toward the property. When Hicks saw Wood, he looked up and said, "Oh, Brandon. I'll go get

4

him." Prothro walked out in the middle of the street and heard a gunshot. He looked down the hill and saw Hicks standing "a foot or two" outside the door of his truck with a rifle in his hands. Prothro saw Hicks fire several more shots. Hicks jumped back into his truck and took off.

Prothro left the residence and went to look for Wood. Initially, Prothro believed that Wood hadn't been shot. But another man told Prothro that Wood had been hit. Prothro ran into the woods and found Wood tangled in the briars. He picked up Wood and carried him to the road, where they told others to call 911. Prothro stayed with Wood until he "watched his eyes roll back in his head and laid back down," but he knew Wood was gone.

John Chatelain also witnessed the shooting. He heard a "little commotion" outside of his trailer and went outside to see what was going on. He saw Hicks arrive at the property in a black Chevy extended cab step-side pickup truck. He spoke to Hicks, who told Chatelain that he "was up there trying to get Maria." While he was talking to Hicks, Wood walked toward the property. When Wood walked up the road, Chatelain heard Hicks say, "Oh, Bwood. Oh, I got something for him." Hicks then pulled up to the next driveway and got out of his vehicle. As Hicks got out of his vehicle, Chatelain observed Hicks holding a "gun with a large scope on it and he proceed[ed] to fire off several rounds." As Wood turned around to run away into the

woods, Chatelain saw Hicks continue to fire. Hicks then "immediately peeled off and hauled ass."

Chatelain ran into the woods with Prothro to check on Wood. He found Wood tangled up in vines, unconscious. Chatelain attempted to wake up Wood. Chatelain noticed a couple of spots on Wood's back where he had been shot as well as a few bruises on the front of Wood's body.

Chatelain and the others who were at the residence that day carried Wood out of the woods and onto the roadway. As soon as Wood stopped breathing, Chatelain performed CPR on him "for the better part of 30 minutes" until responding officers arrived.

Dresden Chatman also heard several shots fired at the residence. When the shots were fired, Chatman saw Wood fall back and "take off running towards…the woods." He saw Hicks speed off in his truck, staying at the end of the road for a few moments, and then driving off. Chatman assisted the others in helping Wood out of the woods.

Wood did not survive the shooting. According to his death certificate and the pathologist who performed the autopsy, he died on September 23, 2019, caused by internal bleeding and multiple gunshot wounds to the chest and torso.

After Hicks left the scene, Prothro found Hicks's phone next to the skid marks on the bridge where Hicks sped off. He picked up the phone, swiped it, and saw

6

Hicks's picture on the home screen of the phone. Sparkly pink letters, "SWS" and "LT," were on the back of the phone. The phone case was described as either purple or blue in color.

When Hicks realized that he left his phone at the scene of the shooting, he approached Christopher Davis and asked Davis if he could give him a ride to get his phone. Davis asked Hicks where he left his phone, and Hicks told him that "it was where he got out to shoot Bwood at." When Hicks told Davis that he shot Bwood, Davis was in disbelief.

As they were driving, Hicks received a telephone call from Mark Vincent on his grandparents' phone. Vincent, a lieutenant with the Special Assignments Unit of the Hardin County Sheriff's Office, attempted to locate Hicks after Vincent received information that Hicks had been involved in a shooting in Tyler County. Vincent asked Hicks to talk to him in person due to the nature of the offense. Hicks told Vincent that he heard there was a shooting but that he wasn't involved. Hicks told Vincent he would meet him at McDonald's. Vincent went to McDonald's and waited for thirty minutes, but Hicks never arrived.

Hicks didn't meet Vincent at McDonald's because "he wasn't happy about turning around" the car. Instead, he told Davis that they needed to stop to wash their hands. Davis felt like Hicks was threatening him to drive him north because Hicks had a pistol with him. Davis eventually took Hicks to Josh Pelt's house in Hardin

County. After dropping off Hicks at Pelt's house, Davis called law enforcement to tell them Hicks's location.

Vincent ordered units to move to Pelt's house to locate Hicks. Vincent arrived on scene and other officers took Hicks into custody. As Vincent transported Hicks to jail, Hicks on his own voluntarily talked to Vincent. On the drive to jail, Hicks said, "Hey, can you help me on this? I'm going to need help. Can you help me?" Hicks also refused to believe that Bwood was dead.

The next day, Hicks asked to speak with Investigator Seales. When asked about his whereabouts on September 23, 2019, Hicks told Seales that he was at his grandmother's house in Silsbee, Hardin County, all day long. Hicks said that he left the house for about 30 minutes, as he went into town with Davis, but his truck was parked at his grandparents' house all day. Hicks denied being in Warren on September 23, 2019. However, a video surveillance recording from the L&M Grocery Store, which was on the main road between Hicks's grandparents' home in Silsbee and County Road 4470 in Warren, showed a truck matching the description of Hicks's truck traveling north toward Warren shortly before the shooting. He told Seales that his cell phone had been missing since the morning of September 23, 2019 and accused Clowers of stealing it.

After obtaining a search warrant, officers searched Hicks's truck. In executing the search warrant, Seales found casings in the truck that corroborated the statements

8

he obtained during his investigation. He found two .22 caliber casings on the floorboard and in the front driver's seat. Investigators later located two more .22 caliber casings at the scene of the shooting. A forensic examiner determined that the four cartridges had all been fired from the same gun.

The jury found Hicks guilty of murder. The jury thereafter assessed punishment at confinement for life in the Texas Department of Criminal Justice. Hicks then filed this appeal.

*Issue 1: Sufficiency Challenge*

In Hicks's first issue, he argues the State failed to present sufficient evidence to support his conviction. Hicks argues that while the evidence presented by the State shows Hicks "may have committed the offense," the State failed to present sufficient evidence to prove beyond reasonable doubt that he murdered Brandon Wood. He claims the State's evidence is flawed to the point it does not support a conviction.

*Standard of Review and Applicable Law*

We review Hicks's legal-sufficiency arguments under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). Under *Jackson*, the relevant inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318-19 (emphasis in original); *see Brooks v. State*,

323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In reaching a verdict, the jury is the judge of the credibility of the witnesses and may assign the weight it chooses to assign to the testimony it hears during the trial. *Penagraph v. State*, 623 S.W.3d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Wilson v. State*, 504 S.W.3d 337, 347 (Tex. App.—Beaumont 2016, no pet.). On appeal, a reviewing court does not sit as a thirteenth juror and then substitute its judgment for the judgment the factfinder made based on the evidence it heard at trial. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see also Brooks*, 323 S.W.3d at 899. Instead, we must defer to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence the parties present to the jury in the trial. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). If the testimony the parties present to the jury conflicts, we presume the jury resolved that conflict in a manner that favors its verdict. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). To decide whether the inferences the jury made in reaching its verdict are reasonable, we examine the combined and cumulative force of the evidence after viewing it in the light that favors the verdict the jury reached. *Clayton*, 235 S.W.3d at 778. We treat direct and circumstantial evidence equally in our review. *Id.* We will not disturb the jury's verdict if "any rational fact-finder could have found the elements of the charged offense beyond a reasonable doubt." *Fernandez*, 479 S.W.3d at 838.

10

*Discussion*

Hicks argues conflicting testimony regarding whether Hicks remained in Silsbee or traveled to Warren on the day in question does not establish guilt. Similarly, he argues that circumstantial evidence that a truck similar to his truck on a roadway that may have been en route to the crime scene is insufficient to establish guilt. According to Hicks, even if the evidence showed he was at the crime scene, "[m]ere presence at the scene of a crime is insufficient to support a conviction." Hicks also claims that his "green light" comment which was interpreted by law enforcement as a death threat does not establish guilt beyond a reasonable doubt.

The jury, as the factfinder, had the responsibility to reconcile any conflicts in testimony presented at trial and could have believed or disbelieved any witness's testimony. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (it is the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts); *see also Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (contradictions in evidence are reconciled by the jury and will not result in reversal so long as there is enough credible testimony to support the verdict.) To the extent there was any contradictory testimony about Hicks's whereabouts on the day in question, the jury was entitled to decide who and what to believe. The jury was free to disbelieve Hicks was in Silsbee at the time of the shooting because that was a reasonable view of the

evidence when considered as a whole. *See Jackson*, 443 U.S. at 318-19; *Brooks*, 323 S.W.3d at 912.

Hicks's invitation for us to view certain evidence in isolation and determine that it is insufficient to support a conviction is inconsistent with our responsibility to view the evidence as a whole and in a light that favors the jury's verdict. The evidence at trial went beyond "mere[ly]" placing Hicks at the scene. Two witnesses (Chatelain and Prothro) testified they saw Hicks shoot Wood, and another witness (Davis) testified that later that day, Hicks admitted to having shot Wood. But, Hicks argues, Chatelain's and Prothro's testimony is insufficient because they admitted to having used methamphetamines on the day in question.

A rational jury could believe that Prothro and Chatelain accurately recalled the events of that day despite the drug's influence. *See Vasquez v. State*, 67 S.W.3d 229, 237 (Tex. Crim. App. 2002). The fact that a witness is under the influence does not render the witness's testimony legally insufficient. *Id*. To the extent any witness was using methamphetamine on the day of the shooting, it was the jury's prerogative to assess the witness's credibility and to decide whether the witness's testimony accurately and reliably portrayed what actually occurred.

Hicks also argues Davis's testimony lacks "the indicia of reliability" because he bore some animosity toward Hicks since Davis claimed to have been under duress from Hicks during their interactions after the shooting. As "the exclusive judge of

12

the facts" (Tex. Code Crim. Proc. Ann. art. 36.13), the jury was responsible for assessing whether Davis was under duress, whether he bore any animosity toward Hicks, the extent to which any such animosity may have influenced Davis's testimony, and, ultimately, whether Davis was telling the truth when he testified that Hicks told him that he shot Wood. "The jury saw the witnesses and heard them testify; they were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. This court would not be justified in disturbing the verdict under the circumstances here present." *Nix v. State*, 198 S.W.2d 907, 908 (Tex. Crim. App. 1946).

Nor was the evidence limited to Chatelain's, Prothro's, and Davis's testimony which Hicks now challenges on appeal as insufficient. Riddick testified that Hicks had been texting and calling her on his way to the location where the shooting took place. She testified that her son saw Hicks with a gun and that after Clowers told Hicks that Wood had hit her, Hicks told Riddick to "start digging holes." Chatman identified Hicks as the driver of the black Chevy pickup truck that pulled into the driveway. He also testified that he believed Hicks had a gun and that after hearing gunshots, he saw Brandon fall back and take off running into the woods, followed by Hicks's speeding away in the truck. Hicks told Seales his cell phone was missing, and a cell phone was found at the scene with symbols similar to those on Hicks's tattoos and social media. And, a forensic witness testified that the casings

13

investigators found inside Hicks's truck matched those found at the location of the shooting.

Hicks argues the State's case was "a house of cards that was never completed" because some of the State's evidence, which the State argued was "absolutely and profoundly necessary" was not admitted. But our review of the sufficiency of the evidence requires us to analyze what was admitted into evidence rather than what was not admitted. After viewing the evidence as a whole and in the light that favors the verdict reached by the jury, we conclude the evidence is legally and factually sufficient to support Hicks's conviction. We overrule Hicks's first issue.

*Issue 2: Testimony from Investigator Seales*

In his second issue, Hicks complains that the trial court erred in admitting hearsay, specifically the statement from Investigator Seales that Hicks appeared at an address near the location of the shooting based on what others had told him. Seales obtained a search warrant for the Facebook account "Blazr Hicks." Based on the records from Facebook, Seales testified that the "Blazr Hicks" Facebook account had information that led him to believe who the shooter was. Seales testified that after Riddick sent driving directions for County Road 4470 to the "Blazr Hicks" Facebook account, Hicks showed up at the scene:

> PROSECUTOR: Okay. So when she sent that description of that location to the account Blazr Hicks, who showed up?

14

DEFENSE COUNSEL: I'm going to object. This is well outside the witness's personal knowledge, Judge.

PROSECUTOR: I'll rephrase.

TRIAL COURT: Okay.

PROSECUTOR: Based on the evidence that you have gathered and the witnesses that you have interviewed and all the other evidence you've gathered, who showed up at the scene?

DEFENSE COUNSEL: And then his answer is going to be based on hearsay, and I object to that.

TRIAL COURT: If he knows the answer, he can answer it.

SEALES: Based on my investigation, believed it to be Blaze Hicks that showed up.

*Standard of Review and Applicable Law*

We review the trial court's admission of evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g); *Bisby v. State*, 907 S.W.2d 949, 952-53 (Tex. App.—Fort Worth 1995, pet. ref'd). An abuse of discretion occurs when the trial court acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Montgomery*, 810 S.W.2d at 380. A trial court's ruling on the admission of evidence will be overturned only if the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's evidentiary ruling is correct on any theory of law applicable to the case, that ruling

15

will not be disturbed even if the trial judge gave the wrong reason for his right ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Hearsay is an out-of-court statement which a party is offering to prove the truth of the matter asserted by the statement. Tex. R. Evid. 801(d). Generally, absent some exception to the rule that prohibits trial courts from admitting hearsay, such testimony is inadmissible. *Id.* 802.

"An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (italics in original); *see also Richter v. State*, 482 S.W.3d 288, 300 (Tex. App.—Texarkana 2015, no pet.). "An extra-judicial statement or writing may be admitted as circumstantial evidence from which an inference may be drawn, and not for the truth of the matter stated, therein, without violating the hearsay rule." *Gholson v. State*, 542 S.W.2d 395, 398 (Tex. Crim. App. 1976); *Dinkins*, 894 S.W.2d at 347; *see also Dominguez v. State*, 474 S.W.3d 688, 698 (Tex. App.—Eastland 2013, no pet.).

*Discussion*

According to the State, Investigator Seales's testimony was offered not for the purpose of proving Hicks was at the scene of the crime, but for the purpose of explaining how Seales reached the conclusion that Hicks was using the "Blazr

16

Hicks" Facebook Messenger account by pointing out that Hicks arrived on the scene shortly after Riddick sent a message to that account in which she provided directions to her location. In *Dinkins*, the Court of Criminal Appeals explained testimony that would otherwise be hearsay is not hearsay when it is introduced for the limited purpose of explaining how the defendant came to be a suspect. 894 S.W.2d at 347. Whether Seales's testimony was admissible for the purpose of explaining why he concluded Hicks was using the "Blazr Hicks" Facebook account falls within the zone of reasonable disagreement, and the trial court was within its discretion to allow the admission of the testimony for this purpose. [1]

Even if the trial court erred by admitting the testimony Hicks claims was inadmissible as hearsay, the erroneous admission of evidence in a trial is non-constitutional error that is subject to a harm analysis. Tex. R. App. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). A non-constitutional error that does not affect substantial rights must be disregarded. *Taylor*, 268 S.W.3d at 592; Tex. R. App. P. 44.2(b). We may disregard errors in admitting hearsay if, after examining the entire record, we have fair assurance that

---

[1]Hicks could have asked the trial court for a limiting instruction. *See* Tex. R. Evid. 105(a) (requiring courts, on request, to give juries limiting instructions when the proponent has offered evidence for a restricted purpose).

17

the error did not influence the jury or had but a slight effect. *Id*. Even when we disregard the testimony that Hicks complains about in issue two, the evidence supporting Hicks's conviction is substantial, as discussed in issue one. Other witnesses testified based on their own personal knowledge that Hicks was at the scene of the shooting. Riddick testified that she sent the description of her location to the "Blazr Hicks" account, and a little while later, Hicks showed up. Considering the record as a whole, we conclude that Seales's testimony either did not influence the jury, or had but a slight effect. *See id*. Therefore, we hold that even if the trial court erred by admitting the testimony, Hicks is not entitled to a new trial. Tex. R. App. P. 44.2(b). We overrule Hicks's second issue.

### Issues 3 and 4: Prothro's Written Statement and Investigator Seales's Body Cam

Because Hicks's third and fourth issues are related, we address them together. In issue three, Hicks complains that the trial court erred in admitting State's Exhibit Number 26, a written statement of witness Joseph Prothro. At trial, Prothro testified that he saw Hicks at the scene with a rifle in his hand firing shots. He also testified that he saw Hicks standing close to his black pickup truck when he fired the rifle.

During cross-examination, defense counsel questioned Prothro regarding methamphetamine use. Prothro admitted that on the day of the shooting, he was spending time with people using methamphetamine at that location. He also admitted

18

that he "used to [use] back then" and was a frequent user of methamphetamine. He testified that he had used methamphetamine the day before the shooting. When asked if methamphetamine impaired his judgment, Prothro responded, "Not mine, no." When asked if it impaired his memory, Prothro said "No." Likewise, when asked if he ever recalled a time using methamphetamine that harmed his ability to remember what happened about something, he replied "No, sir."

The State thereafter proffered a statement that Prothro gave to Investigator Seales on September 23, 2019, detailing his contemporaneous account of what he saw that day. Hicks objected to the statement as a prior consistent statement and hearsay. The State responded that Hicks opened the door to Prothro's judgment and memory and that they intended to use the statement to show that Prothro's memory was not impaired. The State added that it was "[u]sed to impeach him[]" so "it comes in." The trial court overruled Hicks's objection.

In his fourth issue, Hicks complains that the trial court erred in admitting State's Exhibit Number 27, the body cam video of Investigator Seales. The video shows portions of a conversation he had with Prothro and Chatelain after Seales arrived at the scene of the crime. Hicks complains the statements made by Chatelain and Prothro on the bodycam are hearsay statements.

During cross-examination of Chatelain, defense counsel asked Chatelain if he consumed methamphetamine the day of the shooting, to which Chatelain replied,

19

"No, sir." Defense counsel also questioned Chatelain if he had been using any drugs today, to which he replied, "No, sir." On cross exam, Chatelain admitted that methamphetamine impacts people's judgments and their memory. Thereafter, the State offered Investigator Seales's recording of his conversations with Prothro and Chatelain at the scene on the day of the shooting.

Hicks objected to State's Exhibit 27 as hearsay statements that were being offered for the truth of the matter asserted. The State responded that the video was a response to defense counsel's cross-examination of Prothro and Chatelain which questioned their memory, drug use, and the accuracy of their testimony. The State said that the video was also highly relevant because it shows that Chatelain's "behavior today is almost identical to his behavior on [Seales's] body camera." The State also argued that the recording depicted Prothro and Chatelain's excited utterances and present sense impressions. Hicks disagreed with the State's characterization of the recording as a present sense impression, arguing that the statements were made thirty minutes after the event and not at the time of the event. The trial court overruled Hicks's objection and admitted State's Exhibit 27.

*Standard of Review and Applicable Law*

Under Rule of Evidence 613(c), a witness's prior consistent statement is not admissible to bolster the witness's credibility, but it is admissible to rebut an express or implied charge of recent fabrication. Tex. R. Evid. 613(c), 801(e)(1)(B). Rule

20

801(e)(1)(B) of the Texas Rules of Evidence gives a substantive, non-hearsay status to prior consistent statements of a witness "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (citing Tex. R. Evid. 801(e)(1)(B)). For the prior consistent statement to be admissible, it must meet four requirements: (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Id.*

"The rule sets forth a minimal foundation requirement of an implied or express charge or fabrication or improper motive." *Id.* An attack upon the accuracy of a witness's memory is enough to permit the introduction of a prior consistent statement. *See id.* "[T]here need only be a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial." *Id.* (cleaned up). The trial court has substantial discretion to admit prior consistent statements under the rule as there only needs to be a suggestion of conscious alteration or fabrication. *Id.* at 804-05.

"[A] charge of recent fabrication or improper motive may be subtly implied through tone, tenor, and demeanor during the entirety of the cross-examination; such an attack may not be immediately apparent from the specific wording of the questions asked, but becomes obvious only during the attorney's final argument." *Id.* at 799. "[M]uch of the force of cross-examination depends upon the tone and tenor of the questioning, combined with the cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues." *Id.* at 808 & n.27. With that in mind, reviewing courts should focus on "the purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." *Id.* at 808 (cleaned up). We may also consider clues from voir dire, opening statements, and closing arguments. *Id.* at 808. Thus, in determining the admissibility of a prior consistent statement, the dispositive question is whether, given the totality of the circumstances, including tone, tenor, and demeanor, a reasonable trial judge could conclude counsel was "mounting a charge of recent fabrication or improper motive" against the testifying witness. *See id.* at 808-09. But the "rule cannot be construed to permit the admission of what would otherwise be hearsay any time a witness's credibility or memory is challenged," as adopting such a broad rule would turn virtually all "prior consistent statement[s] into non-hearsay." *Id.* at 805 (cleaned up).

Because there is no "bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication," a trial court has "substantial discretion to admit prior inconsistent statements" under Rule 801. *Id.* at 805. A trial court's determination that a prior consistent statement is admissible because the cross-examination suggested or implied an assertion of recent fabrication or improper motive is reviewed only for an abuse of discretion. *Id.* at 806.

*Discussion*

Hicks argues that the "prior written statement was hearsay and not admissible for any purpose" and instead "was offered to bolster Prothro's testimony when it had not been impeached." According to Hicks, "the record establishes that the witness was not impeached during his testimony. Quite the contrary, he was questioned regarding his methamphetamine use, and he stated his abilities of perception were unaffected."

Although defense counsel's cross-examinations of Prothro and Chatelain were brief, the questions focused mainly on their methamphetamine use. Similarly, defense counsel's cross-examination of psychiatrist Dr. Edward Gripon focused exclusively on how methamphetamine affects a user. Defense counsel specifically asked Dr. Gripon if methamphetamine use would degrade someone's memory and observational capabilities as well as whether that user would have delusions. He also asked Dr. Gripon, "if you had the option of relying on an eyewitness that had

23

consumed methamphetamine versus one who had not, which would you prefer?" Dr.

Gripon responded, "the one who had not."

In his closing arguments, defense counsel argued that Prothro and Chatelain "couldn't get their story straight about where the shooting occurred." He questioned the witnesses' sobriety during the incident and even on the stand, implying that their drug use made them not credible:

> And the eyewitness testimony that we're supposed to rely on and [the prosecutor] told you could – you could trust because they saw it, was from people who were – had been at this camper – a lot of them anyway, not all of them but a lot of them had been at this camper smoking meth. So Mr. Prothro, for example. He said he was not doing meth that day. Y'all can take him at his word or not. That's your decision. Credibility of the witnesses is up to you. He said he had used meth there before, though.
>
> ….
>
> And then Mr. Chatelain – y'all remember him – Mr. Chatelain said that he saw the shooting, too, but that the shooting happened 300 and something feet from the bridge. Completely different location. They didn't both see the same thing. They testified – it was like they saw two different things.
>
> Now, I would submit to you maybe this person is in shock. Maybe he's nervous. Maybe he's upset. But I think a reasonable explanation as well for Mr. Chatelain's behavior on the stand and his behavior on this video is that he is intoxicated.

Additionally, defense counsel highlighted in his closing argument Dr. Gripon's testimony that a methamphetamine user's memory and observational

capabilities would be "degraded" and that users were "much more likely" to have delusions.

Given the record, the trial court could have reasonably concluded that defense counsel had mounted an implied or express fabrication charge against Prothro and Chatelain regarding their in-court testimony. Because the trial court was in the best position to evaluate defense counsel's intentions, we hold that the trial court did not abuse its discretion in admitting Prothro's prior consistent statement and the video from Investigator Seales's body camera. Therefore, we need not decide whether the statements were admissible as excited utterances or present sense impressions. We overrule Hicks's third and fourth issues.

*Issue 5: Facebook Messenger Photos*

In his fifth issue, Hicks complains that the trial court erred when it admitted State's Exhibit 18, photographs of Facebook messages on a cell phone, over his hearsay objection.

During his investigation of the murder, Investigator Seales obtained a search warrant directing Facebook to produce records related to an account named "Blazr Hicks." In response to the search warrant, Facebook produced a large PDF document and a zipped file. These Facebook records became State's Exhibit Numbers 14, 15, 16, and 17.

State's Exhibit 14 is a series of messages sent on September 23, 2019 between the "Blazr Hicks" Facebook account and Virginia Riddick's Facebook account. State's Exhibit 15 is a series of messages sent on August 8, 2019 between the "Blazr Hicks" Facebook account and the Facebook account for Maria RaiLynn Clowers. State's Exhibit 16 is a collection of photos from the "Blazr Hicks" Facebook account. The photos include pictures of Hicks shirtless next to a black Chevy pickup truck with the decals "Raggedy," "Panty Dropper," and "Brake Ya Neck" on the windshield. State's Exhibit 17 is a collection of images from the "Blazr Hicks" Facebook account. These images include a picture of a Maltese cross with lightning bolts and the number "1410," a picture of a lion with the words "SWS" imprinted on the image, and a picture of a wolf with the caption, "Everyone wants to be a wolf until it's time do wolf shit" with the acronym "SWS" on top of the wolf.

In a hearing outside of the jury's presence, Seales testified that the Facebook messages he had received from Facebook in State's Exhibit 14 were identical to the messages found and photographed from Virginia Riddick's cell phone that were in State's Exhibit 18. Hicks stipulated that the two sets of messages were the same. The State laid the predicate to admit the messages under Texas Rule of Evidence 902(10) and Texas Rule of Evidence 803(6). *See* Tex. R. Evid. 902(10) (business records accompanied by an affidavit are self-authenticating and require no extrinsic evidence of authenticity in order to be admitted) and *id*. 803(6) (records of a regularly

26

conducted activity are not excluded by the rule of hearsay, regardless of whether the declarant is available as a witness). Over Hicks's hearsay objection, the trial court admitted State's Exhibits 14, 15, 16, and 17. Hicks does not complain of the admission of State's Exhibits 14, 15, 16, and 17 on appeal.

State's Exhibit 14 contains a series of messages exchanged between the Facebook Messenger account of "Blazr Hicks" and "Virginia Hamilton" on September 23, 2019.[2] In the messages, Blazr Hicks asks Virginia to send him the current location for Maria Clowers and Brandon Wood. Virginia sends Blazr Hicks the location. On appeal, Hicks does not challenge the admission of State's Exhibit 14 or Seales's discussion of its contents.

During direct examination of Virginia Riddick, the State offered its Exhibit 18, which were photographs of the Facebook Messenger messages on Riddick's phone between Riddick and the "Blazr Hicks" account from September 23, 2019. She confirmed that the "Blazr Hicks" Facebook account belonged to Hicks.

Hicks objected to State's Exhibit 18 as hearsay, arguing that the State was offering the messages for the truth of the statements Riddick made in the messages. The State then offered Exhibit 18 to prove the identity of the person using the "Blazr Hicks" Facebook account and to identify the person with whom Riddick was

---

[2]Virginia Riddick testified that she used the Facebook account "Virginia Hamilton."

communicating that day. The trial court admitted State's Exhibit 18 with a limiting instruction on Hicks's request. The trial court instructed the jury that Exhibit 18 was being admitted for the limited purpose to attempt to establish the identity of the person with whom Riddick was speaking with in the messages and not for the matter asserted in the document.

The State showed Riddick State's Exhibit 18 and asked her whose photograph was in the exhibit. Riddick testified that the photograph in the account named "Blazr Hicks" was a photograph of Hicks and that she had written to that account before on Facebook Messenger. The State then showed Riddick State's Exhibit 14 and questioned her regarding its contents.

At the outset, we note that Hicks's fifth issue is based on the mistaken belief that Riddick was examined about the contents of State's Exhibit 18, rather than State's Exhibit 14. Hicks's brief claims that "the prosecutor proceeded to do exactly what he claimed he was not going to do, i.e., discuss with the witness the truth of the matters asserted in the documents." However, the record shows that the State questioned Riddick about the contents of State's Exhibit 14, not State's Exhibit 18. And Hicks doesn't complain on appeal about the admission of State's Exhibit 14.

*Standard of Review and Applicable Law*

As indicated above, our standard of review for the trial court's admission of evidence is abuse of discretion, and we will reverse only if the trial court's decision

28

to admit the evidence was "outside the zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391. Texas Rule of Evidence 802 provides that hearsay is generally inadmissible. Tex. R. Evid. 802. For a document or statement to meet the definition of hearsay, it must be offered to prove the truth of the matter asserted therein. *Id*. 801(d)(2).

## *Discussion*

The State contends that it offered Exhibit 18 not for the truth of the matters asserted in the texts, but to show that Riddick had received messages on her phone from the "Blazr Hicks" Facebook account that she personally knew to belong to Hicks. The evidence in State's Exhibit 18 showed Hicks was the user of the "Blazr Hicks" Facebook Messenger account. As shown in State's Exhibit 17, which is not challenged on appeal, the Facebook account "Blazr Hicks" contained shirtless photographs of Hicks that displayed several tattoos. State's Exhibit 18 also contained a profile picture of a tattooed, shirtless Hicks. Riddick identified the profile picture in State's Exhibit 18 to be a photograph of Hicks. Riddick's identification of the photograph in State's Exhibit 18, as well as her testimony that she knew the "Blazr Hicks" Facebook account to belong to Hicks since she had communicated with him in the past using that account, were plausible reasons for which the trial court could have admitted the challenged photographs of the text messages between Riddick and Hicks, rather than for the truth of the matters asserted in the messages. *See Martinez*

29

*v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) (appellate court may uphold trial court's ruling on any legal theory applicable to the case); *Spielbauer v. State*, 622 S.W.3d 314, 319 (Tex. Crim. App. 2021) (under a discretionary review "appellate courts will uphold the trial court's ruling on any legal theory applicable to the case, even one that was not mentioned by the trial court or the appellee[]"). Admitting Exhibit 18 was within the trial court's discretion.

Nevertheless, even assuming Exhibit 18 was inadmissible hearsay, any error in admitting the exhibit was harmless under the circumstances. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). The messages in State's Exhibit 14, an exhibit to which Hicks did not object, were identical to the messages in State's Exhibit 18; the difference between the two exhibits is that State's Exhibit 18 contained a profile picture for the Facebook account "Blazr Hicks," a photograph which Riddick identified as Hicks and as someone to whom she had written before using that same Facebook Messenger account.

Even when we disregard State's Exhibit 18, the evidence supporting Hicks's conviction is substantial, as discussed elsewhere in this opinion. The trial court gave the jury a limiting instruction that State's Exhibit 18 was to be used to attempt to establish the identity of the person with whom Riddick was speaking in the messages

30

and not for the matter asserted in the document. Considering the record as a whole, we conclude that the testimony Hicks challenges in his appeal either did not influence the jury, or that it had but a slight effect. *See Taylor*, 268 S.W.3d at 592. Therefore, we hold that even if the trial court erred by admitting the exhibit, Hicks is not entitled to a new trial. Tex. R. App. P. 44.2(b).

*Issues 6 and 7: Photographs of Hicks's Tattoos*
*and Texas Ranger Brandon Bess's Testimony*

Because Hicks's sixth and seventh issues are related, we address them together.

In Hicks's sixth issue, he complains the trial court erred in admitting State's Exhibit 32, a collection of photographs from the "Blazr Hicks" Facebook account. Hicks complains that the contents of Exhibit 32 "were harmful to appellant in that they contained out-of-court depictions of appellant and tattoos that the State utilized to urge the jury to convict appellant" and as a result "the trial court committed reversible error in admitting the hearsay." He further complains that the photographs in Exhibit 32 were used "to support the improper position that because of appellant's tattoos, he must be associated with a gang and was a violent and dangerous person and must be guilty."

In Hicks's seventh issue, he complains that the trial court committed reversible error in admitting State's Exhibit 31, a collection of photographs of

31

Hicks's tattoos. Hicks also complains of several portions of Ranger Bess's testimony concerning Hicks's tattoos, gang activity, and his character. This testimony includes Bess's discussion of several tattoos photographed on Hicks in State's Exhibit 31, including (1) the skull with a COVID mask and SS lightning bolts with a W in between, indicating SWS; (2) a large tattoo on the underside of Hicks's arm with the letters SWS; (3) a tattoo with the numbers 14:10; (4) pointed lightning bolts; (5) a "death head" skull with a neo-nazi swastika; and (6) a Maltese cross with a partial death head. Bess concluded that the tattoos in the photographs "would show someone's affiliation or membership in the SWS gang."

Investigators obtained a search warrant to photograph the tattoos on Hicks's body and the State offered those photographs as State's Exhibit 31. Hicks objected to the exhibit on relevance grounds, stating that "no one has described the person having a particular tattoo at the scene or anything of that nature." Hicks also objected that the photographs were "going to be used for the purposes of character attack because it's going to be to show he's got this particular tattoo so he must have this affiliation so he must be this kind of person." Hicks complained that the photographs were "unfairly prejudicial as it relates to a character attack and not probative of anything of value."

The State responded that the tattoos were highly probative to refute a defensive theory that the cell phone, which had "SWS" written on the back of the

32

phone, did not belong to Hicks. The State further explained that the defense had questioned the identity of the person using the Facebook account "Blazr Hicks," which uses the words "SWS" several times in the Facebook messages. Lastly, the State explained that Hicks's defense counsel "stated that the SWS are a bunch of wannabe chumps" such that the tattoos were highly probative to show identity. The State further argued that the photographs were relevant to the issues of ownership of the phone and that "the SWS are tattooed all over Mr. Hicks." The trial court overruled Hicks's objection and admitted State's Exhibit 31.

As a result of the search warrant directing Facebook to produce records related to an account named "Blazr Hicks," the custodian of records for Facebook sent to investigators documents in State's Exhibit 32. The exhibit consisted of several "selfies" of Hicks taken from the "Blazr Hicks" Facebook account. Several photographs showed Hicks driving a pickup truck while either shirtless or with a tank top. The State offered Exhibit 32, telling the court that the photos were relevant because "the defense has opened the door to the fact that Mr. Hicks would never ever provide his own photograph as the home screen of his cell phone, and photographs contained on his Facebook page say otherwise. For that reason, they're highly probative."

Hicks lodged the "same objections[,]" presumably referring back to his objections to Exhibit 31. He then specifically objected that the form of the business

33

records affidavit didn't meet the statutory requirements, and he objected on relevance grounds, claiming that "this is literally just a bunch of pictures of my client taking pictures of himself." The State contended that the photographs in Exhibit 32 went to identity, as they were "almost identical to the photograph on the home screen of the phone that was found at the scene with the letters SWS on the back" and "that one of the photos is taken in the same truck, very similar to the photograph on the phone." The trial court overruled Hicks's objection and admitted State's Exhibit 32.

On appeal, Hicks argues that State's Exhibits 31 and 32 were offered to bolster the testimony of Texas Ranger Brandon Bess, who testified of his familiarity with a group known as the Solid Wood Soldiers, or "SWS," from his experience working murder cases for the Texas Rangers. Bess testified that based on his investigations in law enforcement, "the Solid Wood Soldiers is a white supremacist or white separatist prison gang or prison clique" whose primary focus is criminal activity. He said that it was common for members of the group to mark themselves with symbols or acronyms that are associated with that group in the form of tattoos.

Bess described the significance of the term "wolf pack" as used in the Facebook Messenger messages in State's Exhibit 14, explaining that Solid Wood Soldiers call themselves members of the wolf pack; "[t]hey do everything together as the wolf pack." Looking at the Facebook messages in State's Exhibit 15, Bess agreed that an individual using "SWS" and "wolf pack" would suggest that the user

34

of that account is someone who is a member of the Solid Wood Soldiers. Based on his training and experience as a Texas Ranger and law enforcement officer, he told the jury that the term "green light" in the context of someone who uses the terms "SWS" and "wolf pack" indicates an authorization to assault or kill another person or member.

Bess explained the significance of several of the images in State's Exhibit 17. For example, he testified that the Maltese cross is an image specific to white supremacist prison gangs but would not alone be indicative of an SWS member. He also described how the imagery of two pointed lightning bolts with a "W" are specific to the SWS, as well as the numbers "1410" and "1488."

Bess testified without objection to the testimony relating to the terms "SWS," "wolf pack," "green light" and the various imagery associated with white supremacist gangs and the SWS. When Bess was asked if someone who is not truly associated with the SWS would mark themselves with pointed lightning bolts, Hicks objected on the basis of a character attack, arguing that the State was trying to affiliate Hicks with the SWS in a way that "doesn't make him more or less likely the person who committed this offense." The State responded that they were offering the evidence to "go to the identity because the defense has made an issue of the owner of the cell phone that was dropped at the scene which has the letters SWS on the back." The State argued defense counsel had repeatedly suggested that the phone

belonged to an unknown female because the letters on the back of the phone were pink and glittery. The State proffered that Bess's testimony goes to the "identity of the defendant, putting him at the scene, identifying him and that cell phone."

The trial court overruled Hicks's objection. Hicks asked for a limiting instruction that the evidence is being offered for the purpose of identity and not for any other purpose. After the trial court overruled Hicks's objection, the State added that defense stated "very clearly in very loud, emphatic terms in front of the jury that the SWS are merely a bunch of, quote, wannabe chumps. That was made an issue, the door was opened as to what the SWS are and what they stand for and, therefore, it's highly relevant, probative that this evidence comes in." The trial court agreed to include a limiting instruction in the jury charge. The jury charge included a limiting instruction as follows:

> Some evidence at trial was admitted for the limited purpose of establishing identity and not intended to be considered for the defendant's character. Evidence of the defendant's character is not admissible and must not be considered as part of your deliberations.

Bess then testified that if any person who is not a member of the SWS, Aryan Brotherhood of Texas, or Aryan Circle gang used any of the previously discussed symbols on their body, they would be subject to death or extreme assault. He agreed that sometimes "wannabees" kill people.

36

Bess then reviewed State's Exhibit 31 and explained the meaning of the tattoos on Hicks's body, including (1) a skull with a COVID mask marked with SS lightning bolts with a W in between, indicating Solid Wood Soldiers; (2) a large SWS wrapped around his arm, indicating affiliation or membership with the SWS; and (3) another SWS with a "14:10" below it, indicating a tattoo unique to Solid Wood Soldiers. Bess said that he "would not be surprised" if someone with the tattoos on Hicks's body would also put "SWS" on the back of his cell phone. And although Bess testified he wasn't sure if the letters "LT" meant anything significant in SWS, he did agree that the letters "LT" could represent the rank of a lieutenant.

*Standard of Review and Applicable Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id*. at 83. Before a reviewing court may reverse a trial court's evidentiary ruling, it must conclude that the trial court's ruling "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id*. (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

Texas Rule of Evidence 401 provides that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. Irrelevant evidence is not admissible. *Id.*

37

402. The trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or the needless presentation of cumulative evidence. *Id.* 403. The opponent of the evidence, in this case Hicks, has the burden of demonstrating that the prejudicial effect of the evidence substantially outweighed its probative value. *See Montgomery*, 810 S.W.2d at 389. When a trial court balances the probative value of the evidence against the danger of unfair prejudice, a presumption exists that favors the evidence's probative value. *Feldman v. State*, 71 S.W.3d 738, 754-55 (Tex. Crim. App. 2002). A trial court's Rule 403 balancing analysis generally includes, but is not limited to, four factors: (1) the probative value of the evidence; (2) the potential the evidence has to impress the jury in an irrational but nevertheless indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence to prove a fact of consequence. *State v. Melcher*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

Evidence of a crime, wrong, or other bad act is not admissible to prove a person's character in order to show that, on a particular occasion, the person acted in conformity with that character, although this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Tex. R. Evid. 404(b). The Court of Criminal Appeals has stated "gang membership is highly inflammatory

character evidence likely to cause an individual to be convicted for being a bad person apart from sufficient indicia of guilt regarding this particular crime." *Galvez v. State*, 962 S.W.2d 203, 206 (Tex. App.—Austin 1998, pet. ref'd). That said, evidence of gang membership may be admissible during the guilt-innocence phase to show some non-character purpose like identity, motive, or intent, or to refute a defensive theory. *See e.g., Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Vasquez*, 67 S.W.3d at 239 ("[G]ang-affiliation is relevant to show a motive for a gang-related crime."); *Tibbs v. State*, 125 S.W.3d 84, 89 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that evidence of gang membership is admissible "if it is relevant to show a non-character purpose that in turn tends to show commission of the crime").

*Discussion*

On appeal, Hicks complains the testimony from Ranger Bess was "intended to characterize appellant as a bad actor, a gang member, and a propensity for violence both by himself and by association because of his tattoos." While we note that Hicks's objection to State's Exhibit 31 preserved errors related to those photographs, it did not preserve error for all other gang-related evidence. Under Texas law, "if, on appeal, a defendant claims the trial judge erred in admitting evidence offered by the State, this error must have been preserved by proper objection and a ruling on that objection." *Martinez v. State*, 98 S.W.3d 189, 193

39

(Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)). "A proper objection is one that is specific and timely." *Id.* "Further, with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered." *Id.* (quoting *Ethington*, 819 S.W.2d at 858). "The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury." *Id.*

Defense counsel first objected when the prosecutor asked Bess whether an individual who is not truly associated with the SWS would mark themselves with pointed lightning bolts. But Hicks did not continue to object to all of the gang-related testimony from Ranger Bess, did not obtain a running objection, and did not request a hearing outside the presence of the jury. So, while Hicks preserved error as to the photographs in State's Exhibit 31, he did not preserve error as to other evidence of gang affiliation in the form of testimony from Ranger Bess complained of on appeal. *Martinez*, 98 S.W.3d at 193.

However, even if Hicks had properly preserved all his complaints on appeal, we hold that the trial court did not err in admitting such evidence. Otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered "opens the door." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). A party "opens the door" by leaving a false impression with the jury that invites and permits the other party to present evidence to expose, correct, or rebut

40

the false impression. *Id*. When Hicks complained about the admission of evidence concerning the photographs of Hicks's tattoos taken by Ranger Bess (State's Exhibit 31), the State advised the trial court that the defense had opened the door to the idea that the cell phone found at the scene of the crime, which had the letters "SWS" on the back of the phone, did not belong to Hicks. Additionally, the State argued that the defense had questioned the identity of the user behind the "Blazr Hicks" Facebook account, which used the words "SWS" several times in messages. The State's purpose in admitting the photographs, which showed that Hicks had "SWS" tattooed all over his body, was to connect Hicks to the phone with "SWS" letters found at the crime scene as well as to the "Blazr Hicks" Facebook account which contained several references to "SWS."

When Hicks complained about the admission of the Facebook "selfie" photographs of Hicks, (State's Exhibit 32) the State argued that the defense had opened the door to the idea that Hicks would never use his own photograph as the home screen of his cell phone. The trial court reasonably could have concluded the photos from Facebook were relevant to rebut the defense's theory that Hicks would not have his own picture on the home screen, as the Facebook photos show Hicks taking selfies in a pickup truck.

The trial court also could reasonably conclude the photographs in Exhibit 31 and Exhibit 32 were relevant to rebutting the defensive theory that Hicks was not

present at the scene at the time of the shooting, and that he was not connected to the phone found at the scene and not connected to the "Blazr Hicks" Facebook account. *See Tibbs*, 125 S.W.3d at 89; *see also Vasquez*, 67 S.W.3d at 239-40. The trial court also could have concluded that without this evidence of Hicks's connection to the Solid Wood Soldiers, the jury would have been less able to understand Hicks's connection to the cell phone found at the scene. The evidence was not offered simply to demonstrate Hicks's character or that he acted in conformity with his character but instead went to the identity of the owner of the cell phone found at the scene and the user of the "Blazr Hicks" Facebook account.

Even if we were to assume the trial court erred by admitting the photographs of his tattoos, Hicks has not demonstrated that he was harmed by the admission. While evidence of this nature may have a tendency to impress the jury based on an impermissible inference of character conformity, the trial judge instructed the jury in the charge that such evidence was admitted for the limited purpose of establishing identity and is not intended to be considered for the defendant's character. The charge instructed the jury that evidence of the defendant's character is not admissible and must not be considered as part of deliberations. We generally presume a jury followed a trial court's instruction regarding consideration of evidence. *See, e.g., Thrift v. State*, 176 S.W.3d 221, 223-24 (Tex. Crim. App. 2005); *see also McGregor v. State*, 394 S.W.3d 90, 121 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd)

42

(holding potential inference of character conformity can be mitigated by limiting instruction). We overrule Hicks's sixth and seventh issues.

*Issue 8: Escape from Jail*

In his eighth issue, Hicks complains the trial court committed error when it allowed the State to introduce evidence that Hicks escaped from the Tyler County Jail prior to trial. Hicks complains that the offense was neither relevant nor admissible and was harmful to him, resulting in reversible error.

In a bench conference, the parties discussed the admissibility of Hicks's escape from the Tyler County Jail on May 11, 2021. The State argued that Hicks's escape while waiting on trial is an inference of guilt that can be brought in at the guilt innocence stage of trial. Hicks objected to the escape under (1) Texas Rule of Evidence 402, arguing that the evidence of his escape was not relevant; (2) Texas Rule of Evidence 403, arguing that evidence of the escape is unfairly prejudicial and will have a tendency to confuse the issues in front of the jury; and (3) under Texas Rule of Evidence 404(b), arguing that the escape does not meet an exception to that rule.

In lieu of calling Hicks to testify for the limited purpose of the court's consideration of the escape evidence, and with the court's permission, Defense counsel proffered to the trial court that Hicks would testify he fled the jail to try and spend time with his family when the opportunity arose. According to defense

43

counsel, Hicks escaped jail to go to his grandparents' house because they are aging and in poor health, and Hicks's mother was in such poor health that they thought she would die before trial. According to defense counsel, Hicks also pointed out that his attorney never informed him that the trial court had moved his trial date from May 10 to June 14, so he would have never known of his new trial date of June 14 on May 11.

The State disagreed, pointing out that Christopher Mobley, an inmate who escaped with Hicks, said that as soon as the pair got out of jail, they found someone to give them a ride despite Hicks's calling his grandfather to come pick them up. They went to Hicks's grandfather's house, got a car, and promptly left, where they ran into two Texas Rangers. When the Rangers pulled the pair over, they jumped out of the vehicle and ran into the woods. Law enforcement sent dogs to track Hicks and Mobley, who were found up in the trees. The State did not believe that Hicks's reason for escaping jail was out of concern for his grandparents; the State also pointed out that Hicks went to prison for assaulting his grandparents.

The State pointed out that at a bond reduction hearing in April 2021, Hicks's trial was set for May 10. After the hearing, both parties agreed on April 22 to move the trial date to June 14. The State urged that Hicks was escaping to try to keep from going to trial.

The State also questioned defense counsel's claim that he never told Hicks of the new trial date of June 14; the State characterized Hicks as "about the biggest jailhouse lawyer I've ever seen[]" that knew his case was going on June 14. Besides, according to the State, even if Hicks thought his trial was going in May, all the evidence about the escape shows that the preparations for the escape took several days.

The State also pointed out that, prior to the escape, Hicks asked the State to consider a sentence of 25 years and alternatively a sentence of 10 years. The State rejected both offers. The State argued that it was a reasonable inference that the State's rejection of these offers was a motivating factor in Hicks's escape.

After hearing the parties' arguments, the trial court ruled that the evidence of escape could be heard in front of the jury.

During the guilt-innocence phase of trial, the State presented evidence that on May 11, 2021, Hicks and another inmate named Christopher Mobley escaped from the Tyler County Jail. Hicks and Mobley escaped from the jail around 11:00 p.m. They exited their jail cell into a locked vestibule. From there, they penetrated the roof, going through an air duct to a large exhaust fan at the top of the roof of the jail. The duo used white sheets tied together to rappel down the side of the jail. According to investigators, preparations for the escape took several days. Tracing the signal of

45

a cell phone Hicks's grandmother had given to Hicks, law enforcement found Hicks the next day in a tree in a remote wooded area that appeared to be timber land.

During the guilt-innocence phase, Hicks presented no evidence to explain the reason for his escape.

*Standard of Review and Applicable Law*

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Under Rule 404(b), evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. *Id.* 404(b)(1). However, this evidence may be admissible for another type of purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *Id.* 404(b)(2).

To be admissible under Rules 403 and 404(b), the evidence must be (1) relevant, aside from its tendency to show conformity with character, and (2) the probative value must substantially outweigh any prejudice, while not confusing the issues or misleading the jury. *See id*. 403, 404(b); *see also Page*, 137 S.W.3d at 78; *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004). Relevant evidence,

46

evidence that tends to make a fact of consequence more or less probable, is admissible unless provided otherwise by law. Tex. R. Evid. 401, 402.

Evidence of escape or flight is an exception to Rule 404(b)'s admissibility prohibition because such evidence is admissible as a circumstance from which an inference of guilt may be drawn. *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994); *see also Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011). "To support the admission of evidence of escape from custody or flight[,] it must appear that the escape or flight have some legal relevance to the offense under prosecution." *Id.* "To have such evidence excluded under relevancy challenges, the burden shifts to the defendant to show affirmatively the escape and flight directly connected to some other transaction and further that it was not connected with the offense at trial." *Id.*

Even its admissibility is not prohibited under Rule 404(b), evidence of flight or escape may nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Because Rule 403 favors the admissibility of relevant evidence, it is presumed that relevant evidence will be "more probative than prejudicial." *Montgomery*, 810 S.W.2d at 388.

When undertaking a Rule 403 analysis, the trial court must balance (1) the inherent probative force of the proffered item of evidence with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision

47

on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *See Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). Similarly, in reviewing the trial court's determination of whether evidence should be excluded under Rule 403, we consider the above factors and balance the claimed probative force of the evidence with the proponent's need for such evidence. *Id*. at 641.

"A trial court's Rule 404(b) ruling is reviewed under an abuse of discretion standard." *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). A trial court abuses its discretion when its decision falls outside the zone within which reasonable persons might disagree. *Montgomery*, 810 S.W.2d at 391. "A trial court's ruling is generally within this zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *De La Paz*, 279 S.W.3d at 344. The trial court's ruling will not be disturbed if supported by any legal applicable theory. *Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

*Discussion*

The evidence at trial shows that Hicks, along with another inmate, executed an escape from the Tyler County Jail that took several days of planning and preparation. While in flight, Hicks only briefly visited his grandparents; the evidence at trial showed that he had another vehicle pick him up. Hicks then fled into a wooded area to avoid being apprehended by law enforcement, which found Hicks up in a tree in what is presumably timber company land. The defense did not present any alternative or legitimate reason for Hicks's escape attempt that was not otherwise directly connected with the offense for which Hicks was on trial. The defense argued to the court Hicks's reason for escape was to be with his ailing family members, but the evidence at trial showed he barely saw them after he escaped from jail. Evidence of escape or flight shows a consciousness of guilt of the crime for which the defendant is on trial. *See Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989). The trial court could have reasonably concluded the flight evidence demonstrated Hicks's intent to flee the jurisdiction to avoid being prosecuted in this case.

Hicks also contends the evidence of his escape was unfairly prejudicial and should have been excluded under Rule 403. Evidence of escape from custody has greater probative value than prejudice. *Havard v. State*, 800 S.W.2d 195, 203 (Tex. Crim. App. 1989). We cannot say that the evidence confused or distracted the jury

49

from the main issues, as the evidence was not difficult to understand and did not lead to irrational inferences. The State did not spend an inordinate amount of time on the challenged evidence. "The trial court could have also determined that the challenged evidence was unlikely to affect the jury in an unfair or irrational way, as there is nothing typically inflammatory or emotional about a flight or evasion." *Nguyen v. State*, No. 14-23-00126-CR, --- S.W.3d ---, --- 2024 WL 629109, at *4 (Tex. App.—Houston [14th Dist.] Feb. 15, 2024, no pet.). Finally, the trial court included a proper limiting instruction in the jury charge in which the trial court addressed the jury's use and consideration of any extraneous offense evidence admitted at trial to mitigate any improper consideration of this evidence by the jury when deciding Hicks's guilt.

We cannot say that the trial court abused its discretion in admitting evidence of Hicks's flight. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We overrule Hicks's eighth issue.

*Issue 9: Charge Error – The Law of Parole*

In his ninth issue, Hicks complains that the trial court improperly instructed the jury on the law of parole. The jury charge in the punishment phase of trial included the following language regarding parole:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole

50

until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

Hicks's attorney objected to the preceding three paragraphs:

My only objection – and this is just a form objection. Someday some court of appeals will take this seriously, but they don't right now. But nonetheless I would move to strike the language about parole and the – essentially the language – here it's three paragraphs – but regarding the length of time can be reduced by the award of parole and then it turns around and the last instruction is you are not to consider the manner in which the parole law may be applied to this particular defendant. I think it's basically saying hey, look at this, he can get a lower sentence but don't think about that after we've told you that you can think about that. So I think it's a ridiculous instruction but I know what's in the statute, but that's my objection.

Prior to the submission of the charge to the jury, Hicks's counsel objected again:

I still have my – I know this is a revised charge. I'm going to still make my same objection that I made earlier about the parole language, which is monumentally stupid.

On appeal, Hicks urges this Court to find the instruction regarding parole to be improper and that such instruction caused harm to him. According to Hicks, the instruction is confusing, misleading, and harmful, which denied him due process of law and a fair trial.

51

*Waiver*

To preserve a complaint for appeal, a party must first present a timely request, objection, or motion in the trial court that states the specific grounds for the desired ruling if it isn't apparent from the context of the record to avoid forfeiting the right to raise it on appeal. Tex. R. App. P. 33.1. The trial court must have also ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. *Id.*

Hicks has failed to preserve this complaint for review. "The complaining party bears the responsibility of clearly conveying [their] particular complaint to the trial judge." *Mosley v. State*, 666 S.W.3d 670, 676 (Tex. Crim. App. 2023). "To avoid forfeiting a complaint on appeal, the party must let the trial judge know what [they] want[], why [they] think they are entitled to it, and to do so clearly enough for the judge to understand [them] at a time when the judge is in the proper position to do something about it." *Id.* (cleaned up).

Simply put, Hicks's objections to the jury instruction as being "ridiculous" and "monumentally stupid" do not inform the trial court what the appellant wanted, why he thought he was entitled to it, and fail to inform the trial court of his complaint with enough specificity to allow the trial court to understand his complaint at a time when the trial court was in position to do something about it. Moreover, his appellate argument doesn't comport with the objection he made in the trial. Tex. R. App. P.

33.1; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (holding the complaint on appeal "must comport with the objection made at trial"). We overrule Hicks's ninth issue.

*Issue 10: Improper Jury Argument*

In his tenth issue, Hicks complains that fundamental and egregious error occurred when the prosecutor engaged in improper closing argument regarding the definition of reasonable doubt during the guilt-innocence portion of trial. Prior to closing arguments in the guilt-innocence phase of trial, the trial court instructed the jury on the burden of proof:

> The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

> It is not required that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt.

During presentation of argument to the jury, Hicks's attorney pointed out that the court's charge did not define "reasonable doubt" and that the "State of Texas has decided to trust you with that, trust you with determining what it is." Counsel gave his interpretation of this instruction to the jury:

> And if you're practically certain Blaze did it but you still have a doubt, not an unreasonable doubt, not like aliens came and did it or something like that, but if you have a reasonable doubt, your vote is not guilty. You must be 100 percent free of all reasonable doubt in order to persist

53

in a guilty vote. That is what your oath requires. And if you have a doubt, your oath requires you to vote not guilty.

In rebuttal, the State argued:

Fourth – or third, beyond a reasonable doubt. There is nothing in the law anywhere about beyond a reasonable doubt that says anything about 100 percent, and he knows that.

Hicks did not object to the State's comments.

*Waiver & Proper Jury Argument*

To preserve error regarding improper jury argument for appellate review, a defendant must object and pursue his objection to an adverse ruling. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018); *see also* Tex. R. App. P. 33.1(a). A defendant must contemporaneously object to the statement, request an instruction that the jury disregard the statement if the objection is sustained, and move for a mistrial if an instruction to disregard is given. *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993). A defendant's failure to object to a jury argument, or failure to pursue an adverse ruling to his objection to the jury argument, forfeits his right to complain about the jury argument on appeal. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Even if the alleged error was such that it could not be cured by an instruction, a defendant is still required to object and request a mistrial. *Mathis v. State*, 67 S.W.3d 918, 926-27 (Tex. Crim. App. 2002).

Here, Hicks never objected to the State's comment, so any error is waived. Hicks acknowledges his failure to object to the allegedly improper jury argument, but he argues the State's comments constituted "incurable fundamental error" because it lowered the burden of proof by encouraging the jury to vote guilty even in the absence of proof beyond a reasonable doubt and denied him his right to make a proper jury argument, which implicates his constitutional right to counsel under the Sixth Amendment. Hicks argues that the error was of such a fundamental nature that no waiver existed. Hicks's argument fails to acknowledge that his own counsel's jury argument invited a response to be made by the State.

Permissible jury argument falls within one of four general areas: (1) summation of evidence; (2) reasonable deductions from the evidence; (3) answers to arguments of opposing counsel; and (4) pleas for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); *Lagrone v. State*, 942 S.W.2d 602, 619 (Tex. Crim. App. 1997). A prosecutor may answer jury arguments by the defense as long as the response does not exceed the scope of the invitation. *Andujo v. State*, 755 S.W.2d 138, 144 (Tex. Crim. App. 1998). To constitute reversible error, jury argument must be extreme or manifestly improper, violate a mandatory statute, or inject new and harmful facts into evidence. *Hawkins v. State*, 135 S.W.3d 72, 80 (Tex. Crim. App. 2004); *Dooley v. State*, 65 S.W.3d 840, 843 (Tex. App.—Dallas 2002, pet. ref'd).

In a criminal trial, Texas trial courts do not include a definition or instruction in the jury charge of the phrase "beyond a reasonable doubt." *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (holding that a reasonable doubt instruction is not required but can be used if both parties agree). Accordingly, each individual juror must decide what "proof beyond a reasonable doubt" means and the amount of proof required to meet the beyond a reasonable doubt standard. *See Fuller v. State*, 363 S.W.3d 583, 587 (Tex. Crim. App. 2012) (jurors should supply their own meaning of the phrase "beyond a reasonable doubt" based on "their own common-sense understanding of the words"); *Murphy v. State*, 112 S.W.3d 592, 598 (Tex. Crim. App. 2003) ("each juror must decide for himself what amount of proof would constitute the threshold of beyond a reasonable doubt"); *Garrett v. State*, 851 S.W.2d 853, 859 (Tex. Crim. App. 1993) ("an individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him").

Here, the State's comment that there is nothing in the "law anywhere about beyond a reasonable doubt that says anything about 100 percent" is a substantially correct statement of law and is a fair response to the statement made by Hicks's defense counsel that the jury "must be 100 percent free of all reasonable doubt[.]" *See Fuller*, 363 S.W.3d at 587 (explaining that the term "beyond a reasonable doubt" does not mean proof beyond all doubt). The prosecutor's comment was not fundamental and egregious error because it was invited and in response to an

56

argument by Hicks's counsel which could have left the jury with the impression that the State would have to prove its case with 100 percent proof. We overrule Hicks's tenth issue.

## Conclusion

Having overruled all of Hicks's issues on appeal, the trial court's judgment is AFFIRMED.

KENT CHAMBERS
Justice

Submitted on February 2, 2024
Opinion Delivered August 28, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.